UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SENTYNL THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> v. <br><br> U.S. SPECIALTY INSURANCE CO., <br><br> Defendants. | CASE NO. 19cv1667-LAB-AHG <br><br> **ORDER:** <br><br> **1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. 64];** <br><br> **2) DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT [Dkt. 73];** <br><br> **3) DENYING MOTION TO EXCLUDE AS MOOT [Dkt. 84]; and** <br><br> **4) DENYING MOTION FOR JUDGMENT ON THE PLEADINGS AS MOOT [Dkt. 41]** |

  The question in this case is whether an insurance policy exclusion for claims "arising out of" a business's products is broad enough, under California law, to encompass not only claims for product liability, but also claims for business practices tied to those products. Sentynl Therapeutics, Inc. markets and sells two products, Levorphanol and Abstral, both prescription opioid medications. After receiving a subpoena from the Department of Justice's Opioid Task Force seeking information relating to

the manner in which Sentynl promoted Levorphanol, it sought coverage from its insurer, Defendant U.S. Specialty Insurance Co., for the costs of defending the investigation. USSI declined coverage, citing (among other things) an exclusion in Sentynl's policy for claims "arising out of" its products. Sentynl filed this suit, asserting claims for breach of contract, tortious breach of the implied covenant of good faith and fair dealing, and declaratory judgment. Both parties moved for summary judgment.

"Arising out of" is a broad standard under California law, but it's not unbounded. It doesn't invoke any particular theory of causation, but instead "identifies a core factual nucleus . . . and links that nucleus to the [harm] covered under the policy." *Fibreboard Corp. v. Hartford Accident & Indemnity Co.*, 16 Cal. App. 4th 492, 505 (1993). Because the the Opioid Task Force's investigation is sufficiently linked to Sentynl's opioid products, USSI's motion for summary judgment is **GRANTED**. (Dkt. 64.) Sentynl's cross-motion is **DENIED**. (Dkt. 73). The remaining pending motions—USSI's motion to exclude expert testimony and Sentynl's motion for judgment on the pleadings—are **DENIED AS MOOT**. (Dkt. 84; Dkt. 41.)

## BACKGROUND[1]

Sentynl markets and sells prescription products. (*See* Joint Statement of Undisputed Facts, Dkt. 64-5 ¶¶ 16-17.) It marketed or sold only two products during the relevant time period here: Levorphanol tartrate tablets ("Levorphanol") from 2015 forward and Abstral sublingual tablets ("Abstral") from November 2015 until October 2019. (*Id.* ¶ 19.) Both Levorphanol and Abstral are classified by the FDA as opioid analgesic products. (*Id.* ¶¶ 16-17.)

---

[1] The Court relies where possible on the facts in the parties' Joint Statement of Undisputed Facts. (Dkt. 64-5.) Both parties reserved the right to assert that additional facts are not reasonably in dispute, (*Id.* at 3 n.1), and both lodged numerous documents along with their briefing. To the extent such additional documents received no objection, the Court will treat their authenticity as undisputed.

The Policy

USSI issued a Directors, Officers and Organization Liability Insurance Policy (the "Policy") to Sentynl covering the period from January 31, 2018 to January 31, 2019 (the "Policy Period"). (*Id.* ¶ 1.) The Policy generally insured Sentynl against "Loss[es] arising from Claims first made against it during the Policy Period . . . for Wrongful Acts." (*Id.* ¶ 2.) A "Claim" means, among other things: "any . . . written demand, including any demand for non-monetary relief;" "any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;" "any criminal proceeding commenced by the return of an indictment;" and "any written request or agreement to toll or waive any applicable statute of limitations." (*Id.* ¶ 3.) And "Wrongful Act" includes "any . . . actual or alleged act, error, misstatement, misleading statement, omission or breach of duty . . . by the Insured Organization." (*Id.* ¶ 4.) USSI disclaims any "duty under [the] Policy to defend any Claim." (*Id.* ¶ 5.) The Policy excludes Loss from "Claim[s] . . . arising out of . . . any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the Insured Organization" (the "Goods and Products Exclusion" or the "Exclusion"). (*Id.* ¶ 10.)

The Claim

On August 16, 2018 and within the Policy Period, the United States Attorney's Office for the District of New Jersey's Opioid Abuse Prevention and Enforcement Unit ("Opioid Task Force") served Sentynl with a subpoena (the "First Sentynl Subpoena"). (*Id.* ¶ 20.) The Opioid Task Force is a unit within that Office's Criminal Division, tasked with targeting anyone who illegally profits from opioids. (*Id.* ¶ 21.) Its First Sentynl Subpoena included thirty document requests, grouped into the following categories:

///

1) "Documents Relating to Prior Authorizations and Reimbursement;"

2) "Documents Relating to the Sale and Promotion of Levorphanol;"

3) "Documents Relating to Relationships With and Payments To Health Care Professionals," (with most document requests in this category relating to Levorphanol);

4) "Documents Relating to Specific Health Care Professionals;"

5) "Documents Relating to Pharmacies," (including requests for communications regarding Levorphanol);

6) "Documents Relating to Distributors and Wholesalers," (including requests for documents relating to the setting of Schedule II threshold amounts for distribution of Levorphanol); and

7) "Compliance, Investigations and Lawsuits."

(Dkt. 64-2 at 103-09).

Eighteen of the thirty requests referenced Levorphanol specifically, with at least one such request appearing in all of the above categories except the fourth. (*Id.*) Sentynl, several of its former employees, and one of its third-party vendors subsequently received numerous subpoenas (collectively with the First Sentynl Subpoena, the "Subpoenas") from the Opioid Task Force seeking documents and information relating to Sentynl's marketing practices in connection with Levorphanol. (Dkt. 64-5 ¶¶ 30-59.) The second subpoena directed to Sentynl sought similar categories of documents as those sought by the First Sentynl Subpoena, but in relation to Abstral, rather than Levorphanol. (Dkt. 64-4 at 215-19.)

In subsequent communications, Sentynl was informed and it acknowledged that the potential health care offenses under investigation arose out of its opioid products. (Dkt. 105-4 at 96; Dkt. 73-12 at 154 (stating that Sentynl has only two products).) Sentynl concedes that it can't have

/ / /

engaged in conduct relevant to the Investigation prior to acquiring rights to its first opioid product, Levorphanol. (Dkt. 105 at 5.)

Sentynl first contacted USSI regarding insurance coverage for the Investigation on October 29, 2018. (Dkt. 64-5 ¶ 60; Dkt. 107-7 at 71-76.) USSI declined coverage. (Dkt. 64-2 at 110-112.) Among other things, USSI argued that, if the Opioid Investigation constituted a Claim (a point USSI contests), it "ar[ose] out of" Levorphanol and Abstral, "goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by" Sentynl, and so it fell within the Exclusion. (Dkt. 107-10 at 105.)

USSI and Sentynl each moved for summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing the absence of a factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to show there is a genuine factual issue for trial. *Id.* at 324.

The Court does not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

To succeed on its motion, then, USSI must demonstrate that it is entitled to judgment based on undisputed facts, and all factual disputes must be resolved in favor of Sentynl in evaluating USSI's motion. *Clare v. Clare*, 982 F.3d 1199, 1203 (9th Cir. 2020). This standard is mirrored by the

standard specific to insurance policies, which requires USSI to provide "undisputed facts which conclusively eliminate a potential for liability," with "[a]ny doubt as to whether the facts establish or defeat the existence of a defense duty . . . resolved in the insured's favor." *Atlantic Mutual Ins. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1033 (2002); *see also State Farm General Ins. Co. v. Mintarsih*, 175 Cal. App. 4th 274, 284 n.6 (Cal. App. 2009) ("There is no 'potential for coverage' and no duty to defend . . . if the existence of coverage depends solely on the resolution of a legal question (e.g., the interpretation or application of policy terms).").

The law of California, the forum state, applies to this diversity action. *Bell v. Lavalin, Inc. v. Simcoe and Erie Gen. Ins. Co.*, 61 F.3d 742, 745 (9th Cir. 1995). Accordingly, the Court treats the interpretation of the insurance policy as a question of law subject to the general rules of contract interpretation. *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 647 (2003).

## DISCUSSION

### I. The Exclusion for Claims "Arising Out of" Sentynl's Products Must Be Construed Broadly

The Policy's Goods and Products Exclusion reads, in relevant part:

> "[T]he Insurer will not be liable to make any payment of Loss in connection with a Claim arising out of, based upon or attributable to any goods or products manufactured, produced, processed, packaged, sold, marketed distributed, advertised, or developed by the Insured Organization."

(Dkt. 64-5 ¶ 10.) While the parties dispute whether Sentynl has submitted a Claim and whether other exclusions may apply, those disputes are moot if the Exclusion applies to Sentynl's asserted Claim.

Insurance coverage exclusions are generally construed narrowly against the insurer. *MacKinnon*, 31 Cal. 4th at 648 (2003). But this rule is an offshoot of the general rule that *"[a]ny ambiguity or uncertainty* in an insurance policy is to be resolved against the insurer." *White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 881 (1985) (in bank) (emphasis added). A court can't modify an unambiguous provision under the guise of "construction" to extend or restrict coverage in ways contrary to the policy's unambiguous terms. *See* Cal. Civ. Code § 1639.

In urging the Court to construe "arising out of" narrowly, Sentynl mistakes breadth for ambiguity. The Ninth Circuit Court of Appeals, interpreting California law, construed that phrase in the context of an exclusionary clause as susceptible "to only one reasonable meaning": "originating from[,] having its origin in, growing out of or flowing from or in short, incident to or having connection with." *Continental Cas. Co. v. City of Richmond*, 763 F.2d 1076, 1080 (9th Cir. 1985).[2] Subsequent California decisions confirm this conclusion: "arising out of" is a broad standard, "generally equated . . . with origination, growth or flow from the event." *Southgate Recreation & Park Dist. v. California Assn. for Park & Recreation Ins.*, 106 Cal. App. 4th 293, 301 (2003).

Sentynl seeks to avoid this conclusion by arguing that construing the Exclusion to carve out *this* Claim would "eliminate practically all meaningful insurance" because "[e]verything [Sentynl] did . . . had *some* relationship to" Levorphanol and Abstral. (Dkt. 102-1 at 17.) Instead, it urges the Court to "read [the Exclusion] as related to the subject of products liability." (*Id.*,

---

[2] USSI's Claims Handler testified that the Exclusion is "ambigu[ous]." (*See* Dkt. 73-8 at 56:21-57:3) But "[w]hether a contract is ambiguous is a question of law to be determined by the court from the contract itself." *Edgar Rice Burroughs, Inc. v. Metro-Goldwyn-Mayer, Inc.*, 205 Cal. App. 2d 441, 448 (1962). The Court can't delegate that determination to a witness.

quoting *Ins. Co. of N. Am. v. Electronic Purification*, 67 Cal. 2d 679, 690 (1967).) Quoting that case in snippets, it writes, "'the average businessman' would reasonably read a products exclusion as 'related to the subject of products liability' . . . [and so] it would be improper for a court to interpret the exclusion[] to 'eliminate practically all meaningful insurance' where 'all of [the insured's] business is connected in a broad sense with [the product].'" (Dkt. 102-1 at 17.)

*Electronic Purification* doesn't discuss "products exclusion[s]" generally, as Sentynl claims, but a *particular* exclusion that had to be interpreted according to its language. In its fuller context, the language Sentynl quotes (itself a quote from another case) is used to support the proposition that, where an exclusion calls itself a "Products Hazard" exclusion, a subsection of that same exclusion referring to *operations* must be read as limited by the "Products Hazard" caption. *Electronic Purification*, 67 Cal. 2d at 685-86. "If [the operations] subdivision . . . eliminated coverage for completed general operations, not related to products, . . . it would involve a subject utterly unrelated to products which no ordinary insured would expect to find under the heading, 'Products Hazard.'" *Id.* at 687. To read that exclusion otherwise would "eliminate practically all meaningful insurance" only because it would exclude both products hazards and *all* completed operations without limitation. See *id*. at 690. "The language of the policy compels such a reading." *Id.* at 687.

Different language compels a different reading. The Policy's language still doesn't exclude operations "utterly unrelated to products," *id*., but its limitation isn't the phrase "Products Hazard." The limitation is instead the broader caption of "Goods and Products Exclusion" and the unambiguous phrase "arising out of" that connects matters to Sentynl's goods and products. *Continental Cas. Co. v. City of Richmond*, 763 F.2d at 1080

("arising out of" is unambiguous). And the latter phrase doesn't restrict the Exclusion's application to products liability because it "does not import any particular . . . theory of liability into an insurance policy." *Travelers Property Casualty Co. of America v. Actavis, Inc.*, 16 Cal. App. 5th 1026, 1045 (2017).

While that may make for a broader exclusion, it doesn't eliminate practically all meaningful insurance because there's a difference between Claims "arising out of" products and those that merely have "*some* relationship" to them. (Dkt. 102-1 at 17.) To use Sentynl's examples, its hiring and firing of employees and its financial reporting, to the extent they're only connected to its products by the fact that Sentynl must conduct those activities to do business, don't "arise out of" Levorphanol and Abstral. *See, e.g., Fireman's Fund Ins. Companies v. Atlantic Richfield Co.*, 94 Cal. App. 4th 842, 849 (2001) ("'[A]rising out of' requires more than 'but for' causation.").

## II.   The Undisputed Facts Demonstrate that the Investigation, If a Claim, Would Fall Within the Exclusion

Having determined that the Exclusion can be read to cover theories beyond products liability, all that remains is to determine whether Sentynl's Claim "originat[es] from, ha[s] its origin in, grow[s] out of or flow[s] from" its products. *Continental Cas. Co.* 763 F.2d at 1080. The undisputed facts answer with an unequivocal "yes."

California courts have determined that legal claims for marketing practices tied to the known dangers of opioids, on the other hand, "arise out of" opioids, despite the lack of a product-centric liability theory. In *Travelers v. Actavis*, the insured pharmaceutical company had an insurance policy covering "damages because of bodily injury" but excluding "bodily injury . . . arising out of . . . any goods or products manufactured, sold, handled, distributed or disposed of by" the insured. 16 Cal. App. 5th at

1031-32. Two lawsuits were filed against the insured—they didn't allege that the products were defective, but that the insured "engaged in a fraudulent scheme to promote the use of opioids for long-term pain in order to increase corporate profits." *Id.* at 1032. The insurer denied coverage based, in part, on the products exclusion, and the California Court of Appeal rejected the theory that the phrase "any product" in the products exclusion was limited to *defective* products. *Id.* at 1050. Instead, it found that harm from the insured's marketing practices arose out of the products themselves because those practices were allegedly tied to the products' addictive properties. *Id.* at 1046.

Sentynl acknowledges that the Investigation forming the basis for its Claim is being conducted by a criminal enforcement unit "tasked with . . . target[ing] anyone who illegally profits *from opioids*." (Dkt. 64-5 at 13 (emphasis added).) It states that it couldn't have engaged in any act relevant to the Investigation until after it acquired the rights to Levorphanol. (Dkt. 105-5 at 89:2-9.) And, most directly, it concedes that the potential health care offenses that the Opioid Task Force is investigating arise out of Sentynl's manufacturing, marketing, sale, and distribution of its opioid products. (Dkt. 105-4 at 96.)[3] The Opioid Task Force's Investigation is targeting Sentynl on suspicion that it "illegally profits from opioids" through health care offenses that arise out of its opioid products. The unavoidable conclusion is that the Claim based on that Investigation "originat[es] from, ha[s] its origin in, grow[s] out of or flow[s] from" products that Sentynl marketed or sold. *Continental Cas. Co.* 763 F.2d at 1080.

/ / /

/ / /

---

[3] Although this document post-dates the Subpoenas, Sentynl argues that it should inform the Court's understanding of the Investigation as a whole. (*See* Dkt. 105 at 12-13, § II(B)(1).)

## CONCLUSION

Just as litigation for fraudulent practices in marketing opioids constituted claims for "bodily injuries" "arising out of" the opioids in *Actavis*, the Opioid Task Force's Investigation of Sentynl's potential health care offenses, including inquiry into Senynl's marketing practices, fits comfortably in the broader category of "Claims" "arising out of" those products (to the extent it's a Claim at all). Sentynl's Losses from the Investigation are excluded from the Policy. Its claims for breach of the Policy, tortious bad faith, and declaratory judgment, all based on the theory that the Investigation is a Claim covered by the Policy, all fail as a matter of law.

The Court **GRANTS** USSI's Motion for Summary Judgment. (Dkt. 64.) It **DENIES** Sentynl's Cross-Motion for Summary Judgment. (Dkt. 73.) And it **DENIES AS MOOT** Sentynl's Motion for Judgment on the Pleadings, (Dkt. 41), and USSI's Motion to Exclude Expert Testimony. (Dkt. 84.)

The Clerk is directed to enter judgment in favor of USSI and close the case.

**IT IS SO ORDERED.**

DATED: March 19, 2021

Hon. Larry A. Burns
United States District Judge